Bernard Ryan, P. J.
Raymond D. Fletcher is dead. He was shot down by a parole officer, an employee of the State of New York. His mother, as administratrix, asserts that Fletcher’s death was wrongful and seeks redress at our hands.
Let us examine the facts. In 1953 Fletcher had been convicted of burglary third degree. He had been sentenced and confined and, on May 16, 1956, had been paroled and permitted to return to his home in Buffalo subject to the supervision of the parole officer resident in that city. Fletcher learned a trade, obtained employment, which was steady except for short periods between jobs, contributed to the support of his mother and his minor sister, and reported regularly to the parole officer as required.
On October 16, 1957 claimant’s intestate was in the employment of the Robert Schieder Construction Company, Incorporated. In the same employment was a man known to the parole officer as Richard Yund, but known to Schieder as Henry J. Stewart. Yund was also a parolee and had been a codefendant with Fletcher in the commission of the crime for which Fletcher had been convicted. It was not established upon the trial that Fletcher knew that Yund was employed under the name of Stewart. Fletcher owned an automobile. It was a Cadillac. It was not established that the registration for that automobile described it as another make because the proffered testimony on that point was stricken as hearsay.
Although we do not find in the record of the trial direct proof to support the Attorney-General’s request that “ as conditions of his parole claimant’s intestate was forbidden to own an automobile or to associate with other former convicts ”, it was stipulated by claimant’s counsel that it was proper for the State of New York to issue a warrant for the recapture of Fletcher. The Parole Board did issue such a Avarrant which was valid on its face. OAvnership of an automobile and association with another parolee were the alleged violations Avhich resulted in its issuance.
On October 16,1957 Fletcher and Yund, in the course of their employment by Schieder, Avere engaged in the repair of a building known as 541 East Amherst Street, located at the southeast corner of that street and Parkridge Avenue in the City of Buffalo. They were working on the chimney on the rooftop. Shortly before 2:00 p.m. on that day, a warrant for the arrest of Fletcher was issued by the Area Director of the Board of Parole and handed to Parole Officer Reilly who, accompanied by two other parole officers, Nelligan and Voght, went by automobile *1016 directly to the corner of East Amherst and Parkridge where they saw Fletcher and Yund working on the building. Nelligan, who was driving the automobile, parked it in front of the building. The three then went around to the Parkridge side of the building. Yund was at the base of a ladder. He was told he was under arrest and Yoght handcuffed him. Fletcher, who was up on the ladder, ascended to the roof, which was peaked, went over to the other side and onto the roof of the house next door. Reilly jumped a fence which extended from the rear of the corner building into the next yard. He then went around to the far side of that building into the “ alleyway” (the driveway in Exhibit H) and out into the street. Reilly could see Fletcher “ flattened up” against the side of the roof of the first building east of the corner store. • Here we quote Reilly’s testimony:
“ * * * as I got out into the street, I could see him flatten up against the roof, and I had my gun out. I pointed it, showing him the gun and made some remarks, such as, ‘ Do you see this gun ’, and then I said, ‘ Come down ’. At that point he started back over the same roof to the same side close to the building next door, and he then went out of my sight for a few moments I had to go across the street on the same side of Parkridge — that would be on the north side of Amherst — to see him, and he just sat there — sat on the top of the roof.
“ Meanwhile, police officer Yoght came around to the front of the building, and I could see, as he stood there, that Officer Nelligan had gone to the roof. He had climbed up the roof of the store, and I could see him over on the far side of the roof talking to Raymond Fletcher, as he sat on the roof of the second building. That situation continued for a number of minutes — I don’t know exactly how long — when, suddenly, Nelligan said, 1 He is going off the roof ’. So Yoght started in the alleyway, and I came from across the street behind him. As I reached the backyard * * * Yoght reached for Raymond Fletcher, and he either broke from his grasp, or he didn’t have a full grasp on him, and he jumped over the fence and landed on a pile of lumber and started off through the yard. At that point, I called, ‘ Shoot ’. * # * Yoght shot at him. Yoght hit him, and he went down about in the middle of the yard and fell into a praying position, and I heard him say something, ‘ I didn’t mean it; Mother of G-od help me ’. Then, he slumped on the ground and, at that point, I retraced my steps, ran around to the front of the building to the car where Yund was sitting with the handcuffs on him. ’ ’
*1017 Voght shot immediately. Fletcher was then approximately 8 feet from the fence and not more than 12 feet from Voght. Before Fletcher jumped the fence, Voght had overtaken him, was almost on top of him, had grabbed for him, had got his hand on Fletcher’s clothing and had told him to stop. Voght testified: “ I aimed at his legs, pointing for blank range, only a few feet, paused for a moment and fired. ’ ’ When he raised his gun to shoot he did not sight along the sights, did not bring his hand back to pull the trigger, fired at double action, did not fire any warning shots, shot only one shot, did not say anything about “ Stop or I’ll shoot ”; said only “ Stop ”, The medical examiner reported:
“ An autopsy conducted 10/16/57 revealed a wound tract through the left 8th rib to the left lower lobe, base of the lung, through the lingual of the upper left lobe; through the left ventricle and through the left 5th interspace anteriorly.
“A certificate of death due to gunshot wound of the heart with massive hemorrhage of the left chest, was issued.”
Fletcher was not armed. He had made no menacing or threatening gesture. By the time of the shooting a number of bystanders had gathered in the public streets nearby. A home owner, who lived directly across Parkridge Avenue from the fence over which Fletcher jumped, was an eyewitness to the shooting.
Upon these facts we must determine if the means used by Reilly and Voght were necessary to effect Fletcher’s arrest. (Code Crim. Pro., § 174; Penal Law, § 246.) We recognize that Fletcher was in constructive custody of the Warden of the prison from which he was paroled. (People ex rel. Natoli v. Lewis, 287 N. Y. 478, 481.) Both statutes cited use the word “ necessary ”. Moreover, section 1055 of the Penal Law in defining justifiable homicide, relies upon the word ‘' necessarily ”. Case law and the textbooks follow the statutes. (Conraddy v. People, 5 Parker Cr. Rep. 234; 4 Am. Jur., Arrest, § 80; 26 Am. Jur., Homicide, § 232; 6 C. J. S., Arrest, § 13, subd. b; 40 C. J. S., Homicide, § 102, subds. b, d. See, also, 1 Cooley, Torts [4th ed.], § 96; Wharton, Law of American Homicide, 50, 51.)
We find, upon the facts and circumstances revealed upon the trial of this case, that the arresting officers could with diligence and caution have taken and held Fletcher, that to shoot him to prevent Ms escape was unnecessary, that firing indiscriminately at a man approximately 8 feet away was gross negligence. Upon such findings the State of New York must be held liable. (Court of Claims Act, §§ 8,10, subd. 3.)
*1018 The damages to be awarded are such a sum as is a fair and just compensation for the pecuniary injuries resulting to the person for whose benefit the action is brought. (Decedent Estate Law, § 132.) Fletcher was 23 years old, was a high school graduate, held a vocational certificate in masonry, issued by the State Education Department as a result of his training for rehabilitation, and was earning $2.20 an hour for a 40-hour week. He contributed to the support of his mother, aged 52, and a sister, aged 17. His life expectancy was 40.17 years. We award $30,000 and the funeral expenses which were $938. The clerk will compute interest.
Enter judgment accordingly.