Dorothea E. Donaldson, J.
This claim to recover damages for conscious pain, suffering, and the wrongful death of Kenneth M. Staufenherger arises from the alleged negligence of and assault by the defendant, the State of New York, through one of its employees, a member of the State Police, who fired one bullet from his gun inflicting severe and fatal injury.
Claimant, mother-in-law of decedent, received limited letters of administration for the estate of Kenneth M. Staufenherger on May 25, 1960, from the Surrogate for the 'County of Erie. Decedent left him surviving Arlene Staufenherger, his widow, who was a minor under the age of 21 years at the time of filing of this claim, and Deborah Ann, an infant daughter, born on April 17, 1960. Both widow and child have been residing with claimant since decedent’s death.
The claim, timely filed, has not been assigned or submitted to any other tribunal for determination.
On May 13,1960, a clear day, shortly before 1:00 p.m., 20-year-old Kenneth Staufenherger, who was returning to his place of employment in a 1954 Ford automobile, registered in his wife’s name, drove from the Thruway Plaza into Walden Avenue, a divided highway bordering the Plaza in the Town of Cheektowaga. His exit from the Plaza into Walden Avenue was accompanied by the squealing of tires which alerted the attention of State Trooper Stanley Poquadack, Jr., who had just entered his unmarked car after completion of a medicinal *425 errand at a nearby drugstore. Staufenberger, the lone occupant of the Ford car, stopped at the red traffic signal at Walden Avenue and Dale Road, and chatted with the occupants of a 1954 Oldsmobile in the left-hand lane, going west, at this intersection, both cars racing their motors meanwhile. When the signal turned green, both cars started forward, followed by the trooper in his unmarked car, with the Staufenberger car pulling ahead of the Oldsmobile and cutting sharply into the left lane in front of that car, slowing down and signalling for a left-hand turn. At this point Trooper Poquadack blew his siren and directed both drivers of the Ford and the Oldsmobile to pull over. Mr. Staufenberger pulled onto the shoulder facing westbound across from the Ellicott Drug Company and stopped his car. The trooper, wearing full uniform, left his car and walked in the direction of the Staufenberger Ford. As he was about 10 feet away, the driver of the Ford accelerated his car, pulled back onto the road and drove away at a high rate of speed. Trooper Poquadack immediately returned to his blue 1959 Ford Interceptor ear identified only by DSP plates, turned on his headlights and siren and began pursuit. The Staufenberger vehicle moved west on Walden Avenue, ran through the red traffic signal at Dale Road, made a left turn, and cut through traffic into the Thruway Plaza via the same exit he had originally used. The trooper followed the 1954 Ford through the back of the Thruway Plaza to the front of the Plaza traveling at 70-80 miles per hour, approximately two car lengths apart and continued the chase as the Staufenberger Ford travelled, at times on the wrong side of the road, jumping curbs, and completely passing Stop signs, through side streets in the Town of Cheektowaga and Village of Sloan, variously known as Harlem, Broadway, Rutland, Cayuga, Jackson, Franklin, Crocker, Gates, Hallstead and Love joy. During the course of the chase, the trooper alerted his barracks and was advised the automobile was registered in the name of a woman. He then recommended the setting up of police blocks through the co-operation of the Cheektowaga and Sloan Police Departments. At Lovejoy, a dirt road, as the cars were traveling east, Trooper Poquadack was able to overtake and to ride alongside the Staufenberger vehicle. At this point, it is alleged that the driver of the Ford pulled the steering wheel to the left and struck the trooper’s car on its right front fender, forcing the car to go into and through a mud hole. When the trooper’s vehicle came out of the mud hole, it was behind the Staufenberger car. Both vehicles turned left on Griffith, then onto Gates Street, and then west to Curtis, all residential streets. *426 The trooper followed closely, made a right turn at Curtis and noticed that the Staufenberger car was parked diagonally across the road on the left side at 162 Curtis Street, with a flat tire. The driver of the car had left the vehicle and was running past the house and garage toward the back yard area of 162 Curtis Street. Trooper Poquadack stopped the troop car alongside the Staufenberger vehicle, jumped out and ran after the driver. As the trooper ran, he drew his service revolver from its holster, went into the back yard of 162 Curtis Street, and saw the driver running, about 75 feet away, on the other side of a 4-foot-high wire chain-link fence separating the rear area of 162 Curtis Street from the back yard of 133 Hallstead. The time was approximately 1:05 p.m. The trooper called, advising the man to halt or that he would shoot. As Staufenberger kept running, the trooper stopped, aimed and, using off-hand standing position, fired one shot and Staufenberger fell. The trooper vaulted the fence, looked at the decedent, could see nothing wrong as yet, requested by-standers to call an ambulance, returned to the troop car, radioed for an ambulance, returned to the man to check bleeding, and gave mouth-to-mouth resuscitation. The man was taken by ambulance to Emergency Hospital, where, at about 1:25 p.m., an open thoracotomy was performed in an attempt to stop the bleeding but Staufenberger was pronounced dead at 1:30 p.m. The testimony on the autopsy indicated that the trooper’s bullet entered the outside of decedent’s upper right arm, going through the arm into the right chest and traversing diagonally upward near the top of the right fourth rib into the right lung, tearing the aorta, fracturing the second rib in the left Chest and lodging in the front area of the left shoulder. The cause of death was diagnosed as gunshot wound of the chest, laceration of the aorta and hemorrhage.
Staufenberger was near to his place of employment, the Ellicott Drug Company, at the time Trooper Poquadack first blew his siren and directed him to pull over onto the shoulder. The time was approximately 1:00 p.m., when Kenneth M. Staufenberger was due to return to his job from lunch. Trooper Poquadack testified that, because he heard the squealing of tires on the Staufenberger car, recognized the acceleration of motors when the Oldsmobile and Ford were waiting for the changing of the red traffic light at the intersection of Dale and Walden, and the attitude of the drivers of the two cars, a “ drag race ” was in the making. However, not every competitive encounter between two automobiles accelerated from a *427 street intersection upon a change in the traffic signal constitutes a drag race even though they may jockey for position by passing and repassing each other. It is necessary that, at least by implication, some race course must have been planned by the competitors along a street. (People v. Grund, 14 N Y 2d 32.) This was not shown by the proof adduced.
The trooper testified and the defendant, the State of New York, maintained that Staufenborger’s rapid departure from the approaching trooper after the initial stop, the subsequent chase and the excessive speed of 70 to 90 miles per hour, driving on the wrong side of the road, violation of Stop signs, the striking of the trooper’s car, the subsequent flight on foot, individually and severally constitute a felony, sufficient to constitute assault in the second degree or attempted assault in the second degree on the person of a police officer. It is unquestioned that in the presence of a violation of the law it is the duty of the police to suppress the offence and apprehend the offender. Also, since the 1954 Ford was registered in the name of a woman and a man was the driver of the vehicle and since there had been reports of vehicles being stolen from those parked at the Thruway Plaza, the testimony revealed doubt in the mind of the police officer as to whether the driver of the vehicle was lawfully entitled to its possession.
In order to establish the commission of a felony, as alleged by the defendant, there must be shown a willful intent or there must be a reasonable apprehension of receiving an immediate battery on the part of the victim and especially where a motor vehicle is the instrumentality, there must be physical injury and even physical contact with his body. 1 ‘ If the act which would cause the injury is either prevented or abandoned while ‘ at a distance too great ’ to constitute 1 an actual assault ’ a crime is not made out.” (People v. Knapp, 17 A D 2d 65, 68 [Dissent by Beegan, P. J.].) The Penal Law requires strict construction in order to determine whether or not a felony has been committed. Driving infractions have been specifically defined and do not necessarily constitute felonies, rather are misdemeanors. (Penal Law, § 2.) There is no proof that claimant’s intestate had such willful intent. (Flamer v. City of Yonkers, 309 N. Y. 114.)
Defendant also contended that Staufenberger had been discharged from his job at the Ellicott Drug Company and that merchandise from such drug company was found in the trunk of the 1954 Ford following its examination on Curtis Street. James 0. Spencer, Assistant Treasurer of the Ellicott Drug *428 Company, testified that decedent was discharged because he failed to return from lunch at the expiration of Ms lunch hour on May 13, 1960 at the required time, 1:00 p.m. He indicated that he had no knowledge that there were any articles missing from the store on that day or that Stauffenberger had ever been under suspicion for removal of stock. Decedent’s discharge was effective as of 1:30 p.m., the time of his death. It therefore must be concluded that claimant’s intestate had no knowledge of discharge or accusation of removal of stock without permission prior to the beginning of the chase and at no time prior to his death. This innuendo on the part of the defendant is frivolous.
The State has waived immunity from liability for the acts of its employees while engaged in governmental functions. (Court of Claims Act, § 8.) This immunity applies to acts by members of the State Police in the course of their governmental activities.
Public policy requires that police officers be trained in the use of firearms on moving and silhouette targets and instructed when and how to use them. “ Where an employer entrusts his employees with an instrumentality, intending him to use it, the employee must be trained sufficiently in its use to avoid causing harm to another. The State had the duty of giving its troopers proper instruction in the use of tear gas to enable them to use the same properly and safely in a reasonably foreseeable situation. (Meistinsky v. City of New York, 285 App. Div. 1153, affd. 309 N. Y. 998.) ” (Titcomb v. State of New York, 30 Misc 2d 902, 911.) Troopers are advised not to shoot warning shots but to shoot only when the life of the trooper or of someone else is in danger. Expert testimony from sources other than the State Police indicated that police weapons may be used in times of emergency and warning shots may be made. It does not appear that decedent was armed or dangerous so that an emergency was created requiring the use of the police weapon. There is no proof whatsoever that the trooper’s life or that of anyone else was in danger.
It is contended that Trooper Poquadack discharged his revolver towards decedent’s legs through a barrier, the chain link fence, and that the bullet was deflected by the fence. There is no proof of the veracity of these contentions. With respect to the shot, it must be determined whether such action was reasonable and necessary to effect an arrest. (iCode Crim. Pro., § 174; Penal Law, § 246.) A police officer has a right to use as much force as is reasonably necessary to make an arrest. (People v. Denker, 225 App. Div. 517.)
*429 However, a State trooper may not employ force carelessly or unnecessarily. (Lippert v. State of New York, 207 Misc. 632.) Nor may bis acts be wanton.
Decedent, Kenneth M. Staufenberger, undoubtedly committed the initial wrong in violating the trooper’s demand to remain on the shoulder of Walden Avenue and created the series of events which culminated in his fatal injury. It is questionable whether such a wrong gave license and permission to another to commit another wrong. It is questionable whether the injury inflicted by the trooper is a reasonable corollary to the impetuous, headlong attempt by the decedent to avoid confrontation with police authority. It does not appear that there was any reason why Staufenberger should be apprehended or arrested and nothing that he did before or during the chase exceeded a traffic infraction or perhaps a charge for reckless driving. (McCormick v. State of New York, 34 Misc 2d 806.) It is not possible to conjecture the thoughts that went through Staufenberger’s mind during the course of the chase by car or on foot. Whatever the motive of the claimant’s intestate was to escape arrest, such flight did not give the trooper the right to take his life.
The distance between the trooper and the decedent at the time the weapon was fired was not such as would prevent the arresting officer with diligence and caution to have taken and held the decedent. Trooper Poquadaek had requested the Cheektowaga and Sloan Police Departments to set up road blocks and should have known that such police assistance would have caught Staufenberger. While the officer at all times was acting within the scope of his employment, the method used to obtain decedent’s arrest cannot be justified. To shoot Staufenberger to effect his arrest was unnecessary. This is not proper care in the use of firearms and is not the action expected of a prudent man under similar circumstances. Such omission of proper care is negligence. The firing of a weapon indiscriminately at a man at fairly close range is gross negligence. (Fletcher v. State of New York, 15 Misc 2d 1014, affd. 9 A D 2d 862.) This is negligence and this negligence is chargeable to the State of New York. This negligence is the proximate cause of the death of claimant’s intestate.
Accordingly, it is found that the defendant, the State of New York, has been negligent and is liable therefor; it is found that the decedent was free from contributory negligence and that the claimant has sustained the burden of proof.
The motions to dismiss made by the defendant, the State of New York, upon which decision was reserved, are denied.
*430 The .sum of $85,000 is awarded to Irene Piatkowski as administratrix of the estate of Kenneth M. Staufenberger, deceased, for wrongful death and $1,181.48 for hospital, medical and funeral expenses, or the total sum of $86,181.48.
No award is made for conscious pain and suffering since there is insufficient proof to show that decedent was conscious from the time of the infliction of the bullet to the time of his death.