Henry W. Lengyel, J.
This is a claim for false arrest and imprisonment and assault and battery which occurred on March 1, 1965. The claim was duly filed.
Mr. Dixson was 47 years of age, married, and had two children. He owned and operated a 'service .station in the Village of Potsdam and had done so for 10 years prior to March, 1965. On February 28, 1965, he did not work and spent most of that day relaxing and enjoying himself in the area of the. Village of *101 Potsdam. He stated that he left his home about 1:00 to 1:30 p.m. and went to the Wheel Restaurant where he had two bottles of beer and visited with others in the establishment. He then went to the Quonset Restaurant, where he had another bottle of beer and did some more visiting. From the Quonset, he proceeded to the Arlington Inn, where he had some coffee, did some more visiting, and then went home about 4:00 p.m. He had a “ small bite ” to eat at home and a glass of milk. He left home at about 4:30 p.m. and drove to Tardelli’s Restaurant in Canton where he remained until about 1:00 to 1:30 a.m. Mr. Dixson testified that he visited with the proprietor in his kitchen and other persons in the restaurant. He stated that he had two sandwiches to eat and three bottles of beer during this period. He did not drink any whiskey. He left this restaurant with a Socrates Miragis and they drove in the Miragis automobile to the Chatterbox Restaurant in Potsdam. Mr. Dixson admitted that, as he had had something to drink that evening, he did not wish to drive.
The Chatterbox Restaurant is an all-night restaurant which does not serve alcoholic beverages. Mr. Dixson entered the restaurant, took a seat at the counter, and ordered a steak, french fries, and a salad. While he was waiting for his food, he danced in the small dancing area with a Mrs. Shuck. While they were dancing, two State Troopers came into the restaurant and Dixson testified that he said to Mrs. Shuck “there’s a couple of big bastards.” He stated that he did not know either of the troopers and that he was commenting on their size. The troopers walked by him and did not say anything but, a short time subsequent thereto, Dixson stated that Trooper Sacco motioned for him to come over to his table which he did. He said that Sacco told him to get ‘1 the hell out of the restaurant ’ ’ and he told Sacco that he did not have to leave. He said they had some words in a quiet tone; that he turned to leave the table; and, that he was suddenly grabbed from the rear by his neck and the seat of his pants and started toward the door of the restaurant. He also thought that Trooper Field had a hold on his shoulder on the way to the door of the restaurant. He said they stopped before they got to the door of the restaurant and Sacco told him to put his hands behind him and he was handcuffed. We should perhaps note at this point that,-some days before this event, Mr. Dixson had sustained a fractured right thumb and that his right thumb was in a cast and bandage. He said, after being handcuffed, Sacco gave him a very hard push through the door of the restaurant so that he had to run to keep his balance and to keep from falling. The next thing *102 he knew he was being held by Trooper Field and was being struck by Trooper Sacco. He said he was struck several times and was knocked to the ground. Trooper Field then pulled him to his feet and Dixson said he was pushed over the trunk of a car and struck several more times by Trooper Sacco. Mr. Dixson stated that he had not sworn at the troopers, other than the remark he had made to Mrs. Shuck, that he did not strike or kick at them; and, that he had not resisted the arrest. He was then placed in the troop car and was taken to" the village jail in Potsdam. He said that, about 5 minutes after he was placed in a cell, Trooper Sacco came and washed the blood off his face with wet towels and he was again handcuffed and taken to see a Dr. Stevenson for treatment. Said doctor was not called as a witness by either party. He was then returned to the jail.
The first of the claimant’s witnesses was a Donald Roselle. He had been in the Chatterbox when Dixson came in and had talked to him for a few moments. He did not think Dixson appeared to be drunk. Roselle left the restaurant and was starting to drive away when he saw Dixson come out the door ahead of two troopers. He said Dixson’s hands were behind him and that he saw Trooper Sacco pounding Dixson around the face and neck with his fists. Roselle said he called to Sacco “ that’s a hell, of a way to pound a guy ” and that Sacco hollered back “ get out of here Roselle or I’ll get you later.” Roselle drove away. He was arrested the next night by Trooper Sacco for public intoxication. Mr. Roselle had been drinking that evening and had a record of several convictions for speeding, impaired driving, etc.
Mrs. Shuck was a waitress and bartender at another restaurant in Potsdam. She went to the Chatterbox, after her restaurant closed, to get something to eat. She had had three or four beers previously that evening. She danced with Dixson several times and said he was in a good mood, that he was not boisterous and that she did not think he was drunk. She said when the two troopers came in that Dixson said to her, “ Look at them big bastards.” They finished dancing and went back to their counter stools. She then saw Dixson walk over to the troopers’ table but she did not pay much attention to what went on at the table. Then, she saw the troopers going towards the door with Sacco pushing Dixson ahead of him. She saw them stop and handcuff Dixson’s hands behind his back. She saw Sacco push Dixson through the door with a rough push. She then went to the window of the restaurant and saw Dixson getting up from the sidewalk with blood on his face.
*103 Mrs. Mayfred Reed was at the Chatterbox Restaurant with her sister and husband, having stopped to get something to eat after attending a Heart Fund dance. She knew Mr. Dixson slightly. She saw him dancing with Mrs. Shuck and stated that he seemed to be dancing all right. She saw him go over to the troopers’ table and she did not hear any loud, boisterous talk. She was seated about 15 feet away from the troopers’ table. She then saw two troopers take Mr. Dixson out of the restaurant. One had Dixson by the seat of the pants and the neck.
Mrs. Helen Eggleston was a waitress at the Chatterbox Restaurant. She knew Mr. Dixson and saw him dancing with Mrs. Shuck but did not pay any attention to them. She saw the two troopers come into the restaurant and sit at a table with two other men. She went over to the table to take their order and was standing at the table while Dixson was there. She did not hear any offensive remarks and thought they acted like friends. She went back to the kitchen to fill their order when she heard a rumpus and saw Dixson being shoved out the door. Later that same morning Trooper Sacco came back into the restaurant and she asked him if he still wanted his tea. He said, “ No, we ’ll change our drink and our luck. ’ ’ He was rubbing his hands and said, “ I’ll have a sore hand out of this.”
Mrs. Robar, a sister of Mr. Dixson, operated a taxicab business in Potsdam and had stopped in the restaurant to have some coffee. She talked with Dixson and did not think he was intoxicated. She was eating at the counter when she heard unusual noises. She looked around and saw the troopers and her brother at the door of the restaurant. ¡She saw them put the handcuffs on her brother and push him out the door. She went out of the restaurant and observed Trooper Field holding her brother and Trooper Sacco hitting him with his fists. She saw her brother knocked down and then picked up and bent over a car where Sacco punched him some more. She saw blood on her brother’s face and on Trooper Sacco’s hands. Mrs. Robar’s son, Charles, was also in the Chatterbox that evening and he corroborated her testimony in all material respects.
Mrs. Anna T. Doran was claimant’s last witness. This lady was subpeened to appear at the trial. She managed a bar and grill in Potsdam and had gone to the Chatterbox to eat after her bar had closed. She knew Trooper Sacco. When she left the Chatterbox she heard someone call her name and went over to a parked car where she met Trooper Sacco, whom she called “ Mike ”, and was introduced to Trooper Field. She spoke with both of them as well as with an off-duty trooper by the name of Huckle. She then left in her car and the troopers went into *104 the restaurant. She stated that when she was part way home she had a feeling that something was going to happen so she returned to the Chatterbox. As she parked her car she saw Dixson come out of the restaurant being’ shoved by “Mike”. She then saw “Mike” hit him several times while Trooper Field was holding Dixson by his right arm. She stated that Dixson slumped under the blows being struck by Trooper Sacco. She had seen Dixson earlier when he came into the Chatterbox and estimated he had bad 7 or 8 bottles of beer that evening but, in her opinion, he was “ not close to being drunk.”
Trooper Sacco was the first witness for the State. He stated that he and Trooper Field arrived at the Chatterbox Restaurant about 2:15 a.m. They visited for a few moments with Anna Doran and then were invited into the restaurant by off-duty Trooper Huckle and a Mr. Cashman to have a cup of coffee. He and Trooper Field went into the restaurant and as they walked back to the Huckle table he heard Dixson say ‘ ‘ here come those bastards.” He walked by Dixson and sat down at the table and ordered a cup of tea. He heard Dixson call “ Hey Buster ” a couple of times and then said Dixson walked over to the table and put a hand on the table and leaned on Sacco’s shoulder. Trooper Sacco said he could smell alcohol on Dixson and he was mumbling. The trooper said he told Dixson to sit down and that he replied that Sacco was not man enough to make him sit down. With that, Trooper Sacco said he stood up, told Dixson he was under arrest for public intoxication, took him by the shirt and belt and took him out the door of the restaurant. He stated that as they went out the door Dixson twisted away from him and struck at him and fell to the ground. Sacco said he picked Dixson up and that Dixson struck him in the chest with his cast. Sacco said he struck once and only once. He said Dixson kept on punching so he and Trooper Field handcuffed him. They then took Dixson to the jail where Sacco cleaned his face with a wet towel and then called the troop substation and advised the duty officer of what had happened. He and Field then took Dixson to Dr. Stevenson who bandaged his head and they then returned Dixson to jail. Trooper Field essentially corroborated Sacco’s testimony. Both Sacco and Field are about six feet and three inches in heighth and we would estimate weigh between 195 and 215 pounds.
Trooper Bingferd Huckle was off duty and had been traveling about Northern New York during the day and night in question with one, James Cashman. Huckle had a fairly good memory for everything that happened in the restaurant and generally corroborated Trooper Sacco’s story. However, Trooper Huckle *105 had almost a total loss of memory as to how much beer he had had to drink before this occurrence. He seemed to be able to recall that which was favorable and to forget that which was not favorable. We did not give any weight to his testimony or that of Mr. Cashman. The two village police officers both thought that Mr. Dixson appeared to be intoxicated when he arrived at the village jail.
Mr. Dixson was removed from the jail in Potsdam on the morning of March 1 and was taken to the State Police station at Canton, where he was “interviewed” by Sergeant Ernest H. Griebsch. The Sergeant was called at the trial to testify as to what Mr. Dixson told him during the “ interview ”; and, the State also offered in evidence a written resume of the interview which the Sergeant had prepared on May 11, 1965. There was no indication that the Sergeant had advised the claimant of his right to remain silent; that any statement he made might be used against him; that he had the right to have an attorney present; or, that claimant voluntarily, knowingly, or intelligently waived his rights. (See Miranda v. Arizona, 384 U. S. 436.) That which is denominated a confession in criminal proceedings is, of course, identical with statements Avhich are characterized as admissions in civil proceedings. Claimant’s counsel objected to the receipt of this evidence on the ground that it was illegally obtained in violation of his client’s constitutional rights; and, as it could obviously not be used in a criminal proceeding against the claimant, it Avas inadmissible in this civil proceeding. We sustained claimant’s objection and excluded said testimony.
We believe the above question to be an open one in the State of NeAv York. In Sackler v. Sackler (15 N Y 2d 40, 45) the Court of Appeals ruled, in a 5 to 2 decision, that evidence illegally obtained by a private person may be used in civil litigation absent “ constitutional or statutory compulsion for such rejection.” The court, however, specifically left open the question of admissibility as presented herein. It Avas stated (pp. 44-45) of said decision, that: “ For further clarity, it should be noted that the question we are discussing is not as to whether evidence invalidly gotten by governmental people may be used in a civil litigation (see Bloodgood v. Lynch, 293 N. Y. 308; Cleary v. Bolger, 371 U. S. 392) or whether evidence Avrongfully obtained by private individuals may be used by the State in a criminal prosecution. The only question here is Avhether evidence gotten by persons not in governmental service may be rejected in a civil litigation”. We are persuaded that an oral (or written) confession obtained in violation of the Fifth Amendment, which cannot be used in a criminal case against a defendant, cannot *106 be used against said person when he becomes a plaintiff or claimant in a civil proceeding. We cannot believe that the legerdemain of translating criminal confession into civil admission removes the fatal taint of invalidity from such evidence. As stated by Judge Bergau in his dissent to Sackler v. Sackler (supra, pp. 47-48): “ We ought not hang on tenaciously to the remnant of an old rule out of sentiment or by reason of inertia. If we continue to sanction a duality of this kind in the practice it will develop into an" ultimate procedural incongruity which in the end will have to be adjusted. We ought to deal with it now by making the change in the direction of consistency while the criminal practice is adapting itself to Mapp. The change in fundamental viewpoint and the approach to wrongfully obtained evidence have made our rule of admissibility in private cases inconsistent and discriminatory.” (See, also, Reyes v. Rosetti, 47 Misc 2d 517; Chambers v. Rosetti, 40 Misc 2d 620; Rocco v. Travelers Ins. Co., 38 Misc 2d 311; Angrisani v. Rosetti, 36 Misc 2d 523; cf. Matter of Fitzsimmons v. Liuni, 51 Misc 2d 96, revd. on other grounds 26 A D 2d 980.)
It is our opinion that under Miranda v. Arizona (384 U. S. 436, supra) that the law of New York must be brought into conformity with Judge Borgan’s dissent. We point to page 467 of the Miranda decision, where it was stated: “ Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed from being compelled to incriminate themselves.”
We do not mean to imply or to rule that casual or spontaneous statements made by a person to an officer of the. law who is investigating an accident, or even such an occurrence as is before this court, could not be used in civil litigation as an admission, if such statements fell within that category. However, when a person is arrested by the State Police and confinad in jail overnight; when that person is taken from jail by two State Troopers and is driven to the State Police substation; when he is there photographed and then confronted with the full panoply of the law in the person of a State Police Sergeant and the official custodial surroundings while he is “ interviewed ”, without being advised of his constitutional rights; then, whatever statements are obtained from that person must be considered as invalidly obtained and without probative value in either criminal or civil proceedings. Particularly do we believe such a ruling to be mandatory when we realize that employees of the governmental agency which obtained this evidence, *107 although not parties defendant in the civil litigation, are inextricably interwoven into the fabric of the civil litigation.
After the interview at the Canton substation, Dixson was taken by two other troopers to a Justice of the Peace in Nor-wood, where he was charged with public intoxication and arraigned by the Justice. He was released on $10 bail after a plea of not guilty. He was eventually tried before Police Justice Halliday at Potsdam, without a jury, and was found not guilty.
When released on bail, Dixson went to the local hospital where he was treated by Dr. Carl W. Clark, Jr. Said doctor had previously, on February 8,1965, treated Dixson for a compound fracture of his right thumb. On March 1 he found that the right thumb had been refractured and there were abrasions and contusions to the right frontal area of the head, to the left cheek and the right wrist. X rays revealed two fractures in the left side of the face, one of the left zygomatic area and the other of the infer-lateral wall of the left maxillary antrum. The doctor saw Mr. Dixson on four other occasions and on May 11, 1965 referred him to a neurologist for double vision. The doctor testified that the injuries were a competent producing cause of the pain and suffering, particularly the severe headaches, complained of by Mr. Dixson for several weeks after March 1. The refractured right thumb healed in about 5 weeks.
Mr. Dixson sustained medical special damages of $137.50 and legal costs of $50 in the trial for public intoxication.
When claimant proved the arrest; the detention in the village jail; the arraignment and bail; and, the final verdict of not guilty, he established a prima facie case of false arrest and imprisonment. (Tranberg v. County of Nassau, 28 Misc 2d 275, 277.) The burden of proving probable cause or justification for the arrest then shifted to the State. (See Snead v. Bonnoil, 166 N. Y. 325, 328; Schultz v. Greenwood Cemetery, 190 N. Y. 276; Clark v. Nannery, 292 N. Y. 105, 108.) We do not find that the State met its burden of proving probable cause or justification for this arrest.
If we did find such probable cause, we would also find that the State, through the agency of the State troopers, particularly Trooper Sacco, exercised bad judgment and extremely excessive force in effecting this arrest. In such a situation the State must respond in damages. (Piatkowski v. State of New York, 43 Misc 2d 424, mod. 24 A D 2d 544; Lippert v. State of New York, 207 Misc. 632.) We observed all the witnesses very closely and have weighed and considered their testimony carefully and thoroughly. We find that Mr. Dixson had been drinking but that his conduct did not approach that of public intoxication. *108 Wc find that Trooper ¡Sacco acted in a fit of pique and that, when his temper got the better of his training and judgment, he acted with brutal and unrestrained physical force on the body and person of the claimant herein; “he exceeded all proper and rational bounds.” (People v. Denker, 225 App. Div. 517, 520.)
We believe the State Police of New York to be as line a body of law enforcement officers as there exists in this country. We fully realize the difficulties they face in their many and varied daily duties. But, the fine record of this department cannot excuse the actions of an individual officer who transgresses the bounds of decency in the performance of his duties. We believe Trooper Sacco has, generally speaking, a good record as an officer. Perhaps, when he learns that temper and fists are not necessarily an adjunct to good law enforcement, his record will be better.
We reserved decision on the State’s motion to dismiss this claim at the completion of this trial. We now deny said motion.
The claimant herein is awarded the sum of $15,000 for false arrest and imprisonment, assault and battery with resulting injuries, special damages, and shame and humilitation.