Hugh R. Elwyn, J.
In this habeas corpus proceeding which has been referred to this court by the Supreme Court, the Commissioner of Public Welfare of Ulster County seeks to regain the physical custody of Elizabeth St. John, a four-year-old female child, from the respondents, Mr. and Mrs. Michael Liuni, in whose home the child had been placed by the Commissioner for boarding care. The Commissioner has legal custody of the child by virtue of surrenders for placement and adoption duly executed by the child’s parents pursuant to the provisions of section 384 of the Social Welfare Law. The respondents are not related to Elizabeth, nor do they have legal custody. They have her on a temporary foster parent basis pursuant to an arrangement with the Commissioner of Welfare whereby the Department of Welfare assumes full responsibility for the support and maintenance of the child, including medical expenses, and the foster parents receive compensation for their services in providing board and care.
Pursuant to such a general arrangement, although no written agreement was signed by the Liunis with the Department of Welfare and no indication was given as to the length of time the child would spend with them, the department on July 9, 1962 placed Elizabeth in the Liuni’s care when she was only five days old. With the exception of the first five days of her brief life she has known no other home and no other parents. It is conceded by the Commissioner that the Liunis have provided Elizabeth with a good foster home and that their services as boarding parents have been wholly satisfactory.
*98 Sometime during the end of the first year of Elizabeth’s stay in their home, the Liunis inquired of their caseworker if the child were available for adoption. They were advised by the caseworker that it was not the policy of the Ulster County Department of Welfare to place children locally for adoption. Moreover, they were advised that the adoption of Elizabeth was not possible because of a legal entanglement.
It appears that Elizabeth was born to a married woman and fathered by someone other than her husband and that neither the husband of Elizabeth’s mother nor the putative father was available to give their consents. They were further told that in view of the presumption of legitimacy, no adoption of Elizabeth could be contemplated until such time as her mother’s husband was available to give his consent, but that the attorneys for the Department of Welfare were trying to untangle the situation. As it turned out, Elizabeth was nearly two years old before her mother executed a surrender for her adoption on March 4, 1964 and it was not until Elizabeth was two and a half years old that the department succeeded in locating the mother’s husband and obtaining from him a surrender and consent to Elizabeth’s placement for adoption.
After Elizabeth’s arrival the Liunis accepted three other foster children in their home for varying periods of time, but none longer than 10 months. At one time because of the urgings of the Department of Welfare they had three foster children in their home along with their own three children. The other foster children, with the exception of Elizabeth, were returned to the Welfare Department upon request.
At various times during Elizabeth’s stay in their home the Liunis inquired of their caseworker concerning the adoption of Elizabeth, but these inquiries never reached the stage of any serious consideration by the department. The Supervisor of the Child Welfare Division of the County Welfare Department testified that so far as the Liunis were concerned she “ doubt(ed) very much if the study would progress to the stage where an application would have been accepted by the Department; ” further, that if such an application were now made by the Liunis she would not recommend its approval by the Commissioner.
In the first week of November, 1965 while Mrs. Liuni had the care of her own three children and two foster children she suffered a breakdown and was hospitalized for approximately four weeks at the Albany Medical Center. During her confinement Mrs. Liuni’s mother took care of the children until such time as Mrs. Liuni recovered. There is, however, no suggestion *99 that either her own or the two foster children she had in care, including Elizabeth, were uncared for or in any wise neglected. After some period of hospitalization Mrs. Liuni’s recovery proceeded rapidly and according to her own physician, Dr. John Olivet when he last examined her on April 29, 1966 a physical examination was negative with no signs of mental depression. The doctor did acknowledge, however, that Mrs. Liuni had exhibited symptoms referrable to the menopause, that she had received shock therapy during the period of her hospitalization as part of the treatment for involutional melancholia which he defined as mental depression occurring with the menopause, and that in February, 1961 she had undergone a hysterectomy.
The Liunis lay great stress on the fact that Elizabeth has been allowed to remain in their care for nearly four years, during which time they have, of course, developed a great love and affection for the child. In justification of their seeming delay in evolving a permanent plan for the placement of Elizabeth the Welfare Department asserts that in addition to the legal involvements attendant upon securing the parents’ consent to adoption that they were laboring under a medical handicap as well. It seems that Elizabeth was born with a birth defect in the form of a skin blemish on her left temple, clearly visible and to some extent disfiguring. According to Bartholomew J. Dutto, medical advisor to the Welfare Department, it was at first thought that plastic surgery might be necessary to repair this defect and that because of the high financial cost of such medical attention it would be better to keep the child until the Welfare Department could assume the responsibility, since once the department released the child to the adoptive parents the department would no longer have any control over whether it was done or not. The doctor further explained that with the passage of time the birth defect tended to fade and that it was thought medically advisable to see how the defect healed naturally before resorting to surgery.
Upon advice of their medical consultant plans for Elizabeth’s adoption were deferred to await the healing process of time until finally in February, 1966 the department concluded that the birth defect, although still visible, had receded to a point where Elizabeth would be acceptable for adoption. Accordingly, the department made arrangements for Elizabeth to be evaluated by the Albany Child Guidance Center, affiliated with Albany Medical College, Union University, to ascertain her readiness and fitness for adoption. The child was seen by Dr. Lenore M. Sportsman, Director of the Albany Child Guidance Center, on February 17, 1966, and the following day the director ren *100 dered her written report to the Commissioner of "Welfare which reads in pertinent part as follows:
“ This child was evaluated at our Center on 2-17-66.
“ Elizabeth is a beautiful, blue eyed blond who looks and acts more like a five year old. She is a bright, probably superior, child who relates appropriately to adults, although in a somewhat exaggerated fashion.
“ From the history of the boarding mother’s emotional difficulties, we suggest that plans for permanent placement be initiated promptly, giving appropriate consideration to the boarding mother’s vulnerability. It would be well to emphasize to the boarding father the hazard to his wife’s mental welfare if this ambiguous relationship is continued indefinitely. Certainly, he should be helped to see that extended requirements of rearing another child, not yet school age, is likely to impose too great stress on his wife during menopausal period of life, which is difficult for most women and may prove somewhat overwhelming to her.
‘ ‘ This in no way suggests that we arc unmindful of the problems which may arise both for child and mother as separation is proposed and effected.”
Acting upon this report the Commissioner of Welfare advised the Liunis on March 18, 3966 that an adoptive home had been provided for Elizabeth and that the department would like to start to introduce her to her adoptive parents with the co-operation of the Liunis. At the request of Mr. Liuni a meeting was arranged with Department of Welfare officials at which time he advised the department that he and his wife wanted to adopt Elizabeth. They were advised, however, by the department that their request for adoption could not be approved for the following reasons: (1) they were too old. Mr. and Mrs. Liuni are both 48 years of age and it was not departmental policy to approve of adoptive parents who were beyond normal child bearing years; (2) that Mrs. Liuni was not physically able to take the care and responsibility of a young child at this time in view of her then recent hospital stay and emotional difficulties associated with the menopausal period of her life; (3) that the child who is blond, blue eyed and of fair complexion did not match the Liunis ’ ethnic background and (4) that foster parents have no legal claim on children committed to their care and that they have been paid for their services.
The Department of Welfare then demanded that the Liunis deliver the child to them. This demand was refused. The Commissioner of Welfare then obtained a writ of habeas corpus returnable before the Supreme Court, Ulster County on April 25, *101 1966 which on April 29 was referred to this court for trial and determination.
Upon the trial of the issue the respondents contended that the best interest of the child required that she be permitted to remain in the care of the Liunis because (1) the child considers herself a member of this family; (2) that Mrs. Liuni was fully capable of taking care of the child and assuming her role as foster mother and that her prognosis was good; and most importantly, (3) to remove Elizabeth from the Liuni home at this stage of her young’ life would be disastrous to the child’s welfare. Moreover, it is pointed out that Elizabeth has never seen or met the adoptive parents proposed by the Welfare Department and that the only parents she knows are Mr. and Mrs. Liuni, her present foster parents.
In addition to stressing the fine qualities and capabilities as parents of Mr. and Mrs. Liuni, which the Welfare Department virtually concedes, the respondents rely principally upon factor number three — i.e., the disastrous effects which may be expected to befall Elizabeth if she is removed from her foster parents’ home, to demonstrate that her welfare and interest will be best served by permitting her to remain.
In preparation for the trial of this issue the Liunis, without the consent of the Commissioner, permitted Elizabeth to be seen and evaluated by Dr. Donald Schultz, a psychiatrist who testified on their behalf at the trial. Counsel for the Commissioner has moved to strike out all of Dr. Schultz’s testimony regarding his appraisal of the emotional stability of the Liuni family and the neurotic symptoms Elizabeth would be likely to develop were she to be taken from the Liunis, upon the ground that the basis for his testimony was illegally obtained inasmuch as he had not first secured the Commissioner’s permission to make his examination of Elizabeth. The contention is without merit and the motion to strike Dr. Schultz’s testimony is denied. The development in the Federal courts and in many State courts of a rule of exclusion to illegally obtained evidence has its application to criminal matters. It has no application to this proceeding to determine the best interest of a child. Apart from evidence obtained as a result of an unreasonable search and seizure (Mapp v. Ohio, 367 U. S. 643) has not changed the traditional common-law rule followed in New York which sanctions the admissibility of illegally obtained evidence. (Sackler v. Sackler, 15 N Y 2d 40; see, also, Bloodgood v. Lynch, 293 N. Y. 308; Matter of Neff v. Franklinville Roofing Co., 283 App. Div. 903, affd. 308 N. Y. 946; Matter of Thanhauser v. Milprint, Inc., 9 A D 2d 833; Mavity v. Wehner, 22 A D 2d *102 1008; 8 Wigmore, Evidence [McNanghton Rev.], § 2183 et seq.; McCormick, Law of Evidence, ch. 14; Fisch, New York Evidence, § 726.)
At the threshold of any consideration of the issues presented i>y this contest between a Commissioner of Welfare and boarding parents for the custody of a child committed to the latter’s care stands a question as to the power of the courts to review an administrative determination concerning the child’s welfare. It is, of course, firmly established by many authorities that in proceedings for the custody of a child, the child’s welfare is he supreme consideration (Finlay v. Finlay, 240 N. Y. 429; Matter of Bock [Breitung], 280 N. Y. 349; People ex rel. Reisner v. New York Nursery S Child’s Hosp., 230 N. Y. 119; Matter of Bachman v. Mejias, 1 N Y 2d 575; People ex rel. Glasier v. Glasier, 2 A D 2d 289). On this the courts and the agencies would agree — the real point at issue being whether an authorized agency has by virtue of the provisions of section 383 of the Social Welfare Law any “ superior right” to the custody of a child which the courts are bound to respect at the cost of diminishing their traditional role as parens patries to do what is best for the welfare of the child. A resolution of this issue is necessary before we reach the question — what is best for the welfare of the child in this easel
For his authority to remove Elizabeth from the Liuni home and to place her with other foster parents for adoption the Commissioner relies upon subdivision 2 of section 383 of the Social Welfare Law which vests in him the custody of the child during his minority and provides that “ any such authorized agency may in its discretion remove such child from the home where placed or boarded.”
The Commissioner does not claim that his discretion is unfettered and uncontrolled, but contends that the Liuni’s have no legal right with respect to the child’s custody and have no standing to contest his determination that it would be in the child’s best interest to place her with other foster parents for adoption, merely because of their demonstrated love and affection for the child and her affection for them and the devoted care which they have given her while she was in their home. Moreover, he argues “in a proceeding such as this, custody could be determined on consideration only of the superior right of the authorized agency.” (Matter of Jewish Child Care Assn. of N. Y. [Sanders], 6 A D 2d 698, 699, affd. 5 N Y 2d 222, citing People ex rel. Our Lady of Victory Infant Home v. *103 Venniro, 126 Misc. 135, 139; see, also, Matter of Michelic, 200 Misc. 114; Matter of Convent of Sisters of Mercy v. Barbieri, 200 Misc. 112.) “ Any other result, ’ ’ it has been said, “ would give a boarding parent the right to substitute her discretion and judgment for that of the public welfare officials and authorized agencies as to what is best for the welfare of the child, and destroy their supervision and control generally. ’ ’ (Matter of Convent of Sisters of Mercy v. Barbieri, supra, pp. 113-114.)
This latter argument — that decisions depriving the Commissioner of legal custody of the children committed to his care might result in a breakdown of the placement system was effectively answered by Mr. Justice Hart in Matter of Mary I -v. Sisters of Mercy (200 Misc. 115, 121), a case in which the boarding parents succeeded in retaining the child over the claim of the Commissioner, as follows: ‘ ‘ The placement system in these particular proceedings must yield to the welfare of the individual child. This court refuses to sacrifice this infant’s interests because of a claim that the interests of children, not before the court, will be affected by a possible impairment of a placement system, nor is the fact that the result reached may be operative as a precedent in future cases of any great moment. Each case will require an approach with respect to the facts therein presented and weighed accordingly. In other cases there may well be lacking the fact here presented of permitting an infant of the age of six months to remain in a boarding home for four years with the resultant attachment of the child for the boarding parents.”
As for predicating a decision with respect to this child’s custody ‘ ‘ on consideration only of the superior right of the authorized agency” it may be observed that this is directly contrary to the oft-repeated concept that in a custody proceeding the court does not act to determine rights between the parties whether parents or nonparents, bat solely for the protection of infants, qua infants (Finlay v. Finlay, 240 N. Y. 429, 434), a fact noted by the .dissenters in the Appellate Division in Matter of Jewish Child Care Assn. (Sanders) (supra, p. 699).
Moreover, it is impossible to reconcile the foregoing statement with respect to the “ superior right of the authorized agency ” for which People ex rel. Our Lady of Victory Infant Home v. Venniro (supra, p. 139) appears to be the source and upon the basis of which the actual decision in favor of the agency was made with earlier statements made by the court in the same case rejecting the argument that the courts were powerless to interfere with the exercise of the agency’s right to remove the *104 child from the home of boarding parents and asserting the equitable jurisdiction of the Supreme Court, formerly exercised in Chancery to act as parens patriae for the welfare of infants.
The case of People ex rel. Converse v. Derrick (146 Misc. 73), although not directly in point since it involved a custody dispute between a Public Welfare Commissioner and a natural parent who sought to revoke an instrument of surrender, nevertheless contains some apt observations on the need for the power of the courts to review the decisions of welfare agencies. The court says (pp. 77-78): “ The State of New York stands in relation of parens patriae to minor children in the State, and representing the State, it is the function of the Supreme Court to determine the custody of such minors, and such determination is to be based solely on the welfare of the minors. This power of the State and function of the Supreme Court evidently transcends legislative action and contract between individuals. [Citing cases.] This office of the Supreme Court descends from King to Chancery and from Chancery to the Supreme Court of this State. Born in a time when the question of custody could be changed on the misbehavior of parents or of guardians chosen by parents, this power must still be available even in these days of social service organizations and welfare officers so that errors of heart or errors of judgment on the part of officials, as well as misbehavior by parents and by guardians can be remedied by the court.”
The argument that the court is powerless to act for the benefit of the child in view of the discretion conferred upon an authorized agency by section 383 of the Social Welfare Law was also rejected by the court in People ex rel. Catholic Charities of Buffalo v. Hagstots (117 N. Y. S. 2d 818, 823), wherein the court said: “ To me it is a startling proposition that the legislature could, or if it could that it did, intend to take away from the Supreme Court the power which it has always had to determine the custody of children and to grant that power to a welfare agency and to assert that under any and all circumstances, once a child has been boarded out by an agency, that the Supreme Court is powerless to determine what is best for the interest and welfare of the child.”
Considering these views to be sound, I should unhesitatingly opt in favor of the supremacy of the inherent equitable power of the Supreme Court over the administrative determination of welfare agencies as respects the welfare of infants, were it not for the fact that substantially the same views were vainly asserted by the dissenting Judges in both the Appellate Division and the Court of Appeals and that their views did not prevail *105 or serve to prevent a child care association from regaining the custody of a child placed with hoarding parents in the one case in the appellate courts of this State dealing directly with the competing power of the courts and the agencies (Matter of Jewish Child Care Assn. [Sanders], 6 A D 2d 698, affd. 5 N Y 2d 222, supra).
How much validity is left then in the assertion of the dissenting Justices of the Appellate Division in Matter of Jewish Child Care Assn. (Sanders) (supra, pp. 699-700) with respect to the responsibility of the courts for the welfare of infant children? Is it still true, as they say, that “ In the proceeding at bar it is not respondents’ judgment as to what is for the best interests of the child, but that of the court which is determinative [?] The custody of an infant may not be controlled by the established practice of any organization no matter how noble its motive may be. Like any other qualified witness, respondent was entitled to present proof before the court, but the responsibility for determining what course would aid the child’s welfare was solely and independently the duty of the court in the exercise of its vast powers to deal with the custody of infant children.”
Apparently Judge Dye, one of the dissenting Judges in the Court of Appeals, thought that the effect of the majority holding in the Jewish Child Care Assn, case was virtually to set at naught the power of the courts, for in his dissent he writes: “In sustaining petitioner’s application for a writ of habeas corpus, a majority of this court is about to say that the best interest of the infant will be served by compelling the approved foster parents, with whom the petitioner had previously placed the child for custodial care, to surrender her back to the Agency, there to be dealt with as they see fit. This tragic result comes about because of a mistaken notion that the courts are bound to accept an administrative policy of the Agency as controlling their determination rather than to exercise their own traditional power and authority in accordance with the evidence.” (Matter of Jewish Child Care Assn. [Sanders], supra, p. 230.)
Although the Child Care Association prevailed over the efforts of the boarding parents to retain custody of the child, I do not believe that the majority opinion of the Court of Appeals in Matter of Jewish Child Care Assn. (Sanders) (supra) compels any such conclusion as Judge Dye suggests as being the “mistaken notion” supporting the decision. A careful reading of the majority opinion written by Chief Judge Conway shows that the result reached was not predicated upon the superior right of the agency as the Appellate Division said might *106 be done, but rather upon an express finding that “ There is no merit to the appellants’ claim that the Trial Justice failed or refused to exercise independent discretion as to what is in Laura’s best interests, or that he made his determination upon any basis other than her best interests. Consequently, the precise question which this record presents is whether there is such a lack of supporting evidence that we must charge the court below with an abuse of discretion as a matter of law. (See Matter of Bachman v. Mejias, 1 N Y 2d 575, 582; People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 468; People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542; Bunim v. Bunim, 298 N. Y. 391, 393.) It should be remembered that ‘ Questions of custody are, generally, for the Supreme Court, in its discretion, and it is rarely that any such determination by it can raise any question of law for us.’ (People ex rel. Portnoy v. Strasser, supra, p. 542.) * * *
“ From the standpoint of the child’s best interests, therefore, we hold that there was no abuse of discretion by the Trial Justice.” (pp. 227-228, 229).
The precise holding of the majority opinion of the Court of Appeals in Matter of Jewish Child Care Assn. (Sanders) (supra), although affirming the order of the Appellate Division awarding custody of the child to the agency, does not, in my judgment, imply approval of their reasoning or rejection of the power of the Supreme Court over the administrative determination of welfare agencies with respect to the welfare of infants committed to their care. The observations of Judge Dye (dissenting) with respect to the power of the Supreme Court are therefore still apposite to a determination of this case.
‘ ‘ While administrative practices have a useful place in the handling of ordinary matters of administration, such test is wholly inappropriate in this setting. Here we are not dealing with a routine problem of administration, but rather with the fundamental concept underlying the broad and enlightened social welfare program of the State respecting the care and custody of indigent and neglected children, every aspect of which is to be tested in the light of which will best promote their individual welfare. This idea is neither new nor novel in our society. The State as parens patries has always had a deep concern for its infant wards; from birth to maturity their welfare is paramount, even to that of the natural parent (Matter of Bock [Breitung], 280 N. Y. 349), the determination of which belongs solely to the Supreme Court as successor to the Chancellor (Matter of Bachman v. Mejias, 1 N Y 2d 575), which may not be limited or diminished by the Legislature (People *107 ex rel. Reisner v. New York Nursery & Child’s Hosp., 230 N. Y. 119; People ex rel. Mayor of City of New York v. Nichols, 79 N. Y. 582).” (pp. 230-231.)
Substantially the same issues as are presented by this case were before the court in New York Foundling Hosp. v. Strozak (N. Y. L. J., Dec. 23, 1965, p. 11, col. 6) decided by the Supreme Court of Nassau County which likewise involved a custody dispute between foster parents who sought to retain custody of a child who had been placed in their care for nearly five years and the Foundling Hospital which sought to remove the child for placement with its grandparents. Mr. Justice Brennan in denying the writ and continuing the child in the custody of the boarding parents states what I conceive to be a correct position for the courts to take in eases of this kind. The Justice says: “ This court is well aware of the broad discretion granted to authorized agencies, as defined in section 371 of the Social Welfare Law, and as set forth in section 383 (1) of that law with respect to the care and custody of children entrusted to them. It is also recognized that this discretion is not absolute, but is subject to the ultimate equity powers of the Supreme Court as successor to the Court of Chancery (Matter of Bachman v. Mejias, 1 N. Y. 2d 575; People ex rel. Riesner v. N. Y. Nursery & Child’s Hospital, 230 N. Y. 119). The court is also convinced that the opinion of the agency is entitled to great weight, but that the court, in the final analysis, must make its own independent judgment, from all the facts as to what is in the best interests of the child (Matter of Jewish Child Care Assn. (Sanders), 5 N. Y. 2d 223).”
This court will therefore form its own independent judgment concerning this child’s custody, based not on any superior right of the Commissioner of Public Welfare, but solely on what I conceive to be for the welfare and best interest of the child. In making this judgment the Family Court has the same jurisdiction and may exercise the same powers as possessed by the Supreme Court (N. Y. Const., art. VI, § 13, subd. c; Family Ct. Act, § 651).
The Liuni’s efforts to retain custody of Elizabeth are undoubtedly sincerely motivated by their great love and affection for this blond, blue-eyed pretty little girl of four. The depth of their affection and the sincerity of their motives were epitomized by Mr. Liuni when he said: ‘ ‘ The way my wife and I felt was that G-od sent us a foster child to replace the one he took from us.” Moreover, it is conceded by the Commissioner that the Liunis have provided the child with a good home and have been excellent foster parents.
*108 If only the immediate and short-term interests of this child were at stake, it would be an easy matter for the court to conclude, as is so strenuously urged by the respondents and the Adoptive Parents Committee, Inc., that her present welfare might best be served by leaving her in the security of the only home she has ever known to be reared by the only persons she knows as her parents. Such a determination would, of course, absolve the court and all concerned from the responsibility for creating what Dr. Donald Schultz, the psychiatrist who examined the Liuni family and testified on their behalf, saw as such an emotional shock in the life of this young child as would cause her to “ suffer for a good period of her life, perhaps all of her life, with neurotic symptomatology; indeed,” he said, “ she has already developed them.”
On the other hand, Dr. Bartholomew J. Dutto, the medical advisor to the County Welfare Department, while conceding that ‘‘ there would be a temporary trauma at the separation ’ ’ stated that “ given young parents and an adequate home and the attention that would be lavished on her I think that memory at that age is very short, I think that the child would adjust.” Dr. Dutto’s view is also shared by Dr. Lenore M. Sportsman, the Director of the Albany Child Guidance Center to whom the child was referred for pre-adoptive evaluation. Dr. Sportsman, a psychiatrist of eminent qualifications and vast experience in the making of pre-adoptive studies of children to determine their suitability for adoption testified: “I would expect that of course she would have some reaction from being changed from one environment to another, because she has formed love, affectionate relations with people, but having formed good, warm relations, it is my belief, my professional experience, that persons who have had good affectionate relationships make others quite readily. Therefore, I would not expect that there would be lasting harm to the child ”. Upon questioning by the court, as to the severity of the emotional shock to be anticipated by the removal of the child from the foster parent’s home Dr. Sportsman replied: “ In my experience, Your Honor, I cannot say that would — with the stable personality which I observed in the little girl months ago — five — that I would expect this would be an excessive traumatic experience.” Dr. Sportsman did, however, emphasize that the severity of the emotional reaction upon the child depended largely upon the way in which the transition was handled and strongly recommended that if the child were to be placed elsewhere for adoption that the change should not be brought about abruptly but gradually and with the full co-opération of the foster parents and the social *109 workers of the adoption agency. In sum, both Dr. Dutto and Dr. Sportsman felt that the need for finding more suitable adoptive parents for Elizabeth far outweighed the risks of any temporary emotional disturbance the child might suffer as a result of her removal from the Liuni household.
With the experts differing so widely in their opinions as to the severity of the emotional conflicts expected to be generated by the proposed placement of the child with other foster parents the court must evaluate these conflicting opinions as best it can. Frankly, I am inclined to view Dr. Schultz’s fears for the neurotic symptomatology which ho predicts would befall Elizabeth were she to be removed from the Liuni household as somewhat exaggerated. In any event, I find these fears insufficient reason to frighten the court into making a judgment which while preserving intact the mother image Mrs. Liuni represents and freeing the child from “ this worry about the mother leaving,” would at the same time create for Elizabeth and her future security more problems than the psychiatrists have dreamed of. Important as they are, the emotional needs of this child for love and security are not the only, nor are they indeed, the paramount consideration in determining this child’s best interests.
In my judgment any consideration of this child’s welfare which fails to take into account her future status in the family and the community as well as the control and custody of her person is not only shortsighted, but is lacking in an understanding of the importance of status as a source of legal rights (see Matter of Ziegler, 82 Misc. 346) and an appreciation of the realities of the social structure. In a case involving issues similar to that presented here and which resulted in the award of custody to the foster parents over the claims of the agency the court said: ‘ ‘ The question of adoption or its frustration is not controlling on these habeas corpus proceedings.” (Matter of Mary I.-v. Sisters of Mercy, 200 Misc. 115, 123, supra.) I disagree.
Other courts when confronted with essentially the same issue have considered the feasibility of legal adoption to be a relevant factor in a complete appraisal of the child’s welfare. For instance, in People ex rel. Our Lady of Victory Infant Home v. Venniro (126 Misc. 135, 139, supra) the court in sustaining the right of the agency to the custody of the child justified its holding by observing that, ‘'It may be said too, as an additional reason, that since the child cannot be adopted without the consent of the relator, it cannot acquire the complete rights of a child nor enjoy the benefits of a complete parental relationship.” *110 Also in New York Foundling Hosp. v. Strozak (N. Y. L. J., supra), the case on which the respondents and the Adoptive Parent’s Committee, Inc., chiefly rely to justify an award of custody to the boarding parents, the court expressly recognized the importance of adoption in formulating a permanent plan for the placement of the child. In the latter case the boarding parents had made formal application for adoption when the child was a year and a half old and during the subsequent years the case worker for the Foundling Hospital had co-operated with the boarding parents with a view toward having the child adopted by them. The record showed a co-operative attitude on the part of both the foster parents and the agency to achieve an adoption. This circumstance undoubtedly influenced the court in permitting the foster parents to retain custody of the child, but in making this decision the court recognized that it had left some loose ends insofar as the child’s future was concerned for it concluded with the following apology and pious hope: “ The Court is also aware of the fact that a permanent plan of placement is far superior to a temporary one, and that perhaps this decision does not finalize the relationship. It is earnestly hoped that means may be found by which the boy may become the adopted son of the Strozaks.” (N. Y. L. J., Dec. 23, 1965, p. 11, col. 6, supra.)
While the issue in this proceeding is essentially one of custody the matter of status which for this child can only be achieved through legal adoption is so inextricably interwoven with any consideration of her welfare that it simply cannot be ignored. A moment’s reflection upon the status of this child and the responsibilities of the Liunis of an award of custody to them will show why this is so.
In Judge Dye’s dissenting opinion in Matter of Jewish Child Care Assn. (Sanders) (supra, p. 234) he says that giving precedence to the Agency’s policy of neutrality is “ a specious result in any event for, even if custody remained with the appellant, the Agency may continue supervision and visitation.” Such a statement can only he the result of a confusion between “legal custody” and “physical custody.” The Commissioner of Welfare has the legal custody of this child now (Social Welfare Law, § 383, subd. 2). The Liunis have physical custody now; by resisting the Commissioner’s right to remove the child from their home they are in effect asking this court to take the legal custody of the child from the Commissioner and give it to them. If that is not their purpose then there is no point to this proceeding. If the legal custody of this child, as opposed to physical custody, is awarded to the Liunis, then it must follow *111 that the Commissioner no longer would have legal custody. The legal custody of this child with the attendant right to influence and even control its destiny cannot be in both the Commissioner and the Liunis at the same time.
But what of the responsibility for the child’s support which up until now has been assumed by the Department of Public Welfare! If the Commissioner were deprived of the legal custody of the child, ought not the Department of Welfare also be absolved of responsibility for future support and that responsibility shifted to the Liunis who up until now not only have had no responsibility for the support of the child but have been paid for their services. “ Ay, there’s the rub,”* for without the Liunis assuming their full responsibilities as parents through the medium of legal adoption, they have no enforcible responsibility for the support of this child, and if despite their good intentions they should ever fail to meet their responsibilities as parents the County Welfare Department would have no alternative but to assume responsibility for the support of the child. Merely providing instruction and care for the general welfare of this child without also an assumption of the responsibility for the support of the child is insufficient to place the Liunis in loco parentis (Miller v. Davis, 49 Misc 2d 764). To award legal custody of this child to foster parents without their simultaneous assumption of the full responsibilities of parents and the legal guarantee of the rights and benefits that only adoption can provide, is not to assure this child’s future security and welfare, but to cast her to the wolves.
By contrast, through legal adoption the foster parents and the foster child sustain toward each other the legal relation of parent and child and have all the rights and are subject to all the duties of that relationship including the rights of inheritance from and through each other, and the foster child has all the rights of fraternal relationship with natural children, including the right of inheritance from each other (Domestic Relations Law, § 117).
It, therefore, becomes essential, in my judgment, to any thorough and complete consideration of this child’s welfare to ascertain whether the child’s adoption by these foster parents is legally feasible. Unlike the Strozaks, the Liunis never made a formal application for the adoption of this child prior to the institution of this suit. In fairness to the Liunis, it must be mentioned however, that they made known to their case worker their desire to adopt Elizabeth, but their interest in adopting the child never came to the attention of the case supervisor of *112 the Child Welfare Division or to the Commissioner. Subsequent to the commencement of this suit a petition for adoption was filed, but the application cannot be processed because it is not accompanied by an agreement and consent executed by the Commissioner, nor by any of the other supporting documents required by law or the Rules of the Family Court. The Commissioner, although approving of the Liunis as boarding parents has, for the reasons previously mentioned, found them unsuitable as adoptive parents for Elizabeth and has testified that he would not consent to this child’s adoption by them.
The respondents and the Adoptive Parent’s Committee, Inc., contend that the Commissioner of Welfare cannot arbitrarily withhold his consent to an adoption of this child by the Liunis and that in withholding his consent for the reasons he has given he is acting arbitrarily and capriciously. Moreover, they contend that the Family Court has the power to approve an agency adoption without the Commissioner’s consent if the court finds that he is arbitrarily withholding his consent.
If the Commissioner is arbitrary or capricious in withholding his consent to the Liuni’s application for adoption of this child, or is guilty of an abuse of discretion, the Liunis may have a remedy through a proceeding against body or officer under article 78 of the CPLR, but if so, such remedy must be sought in the Supreme Court (CPLR 7804, subd. [b]). By section 113 of the Domestic Relations Law it is provided that “ An authorized agency may consent to the adoption of a minor in its lawful custody. The agreement of adoption shall be executed by such authorized agency.” Section 114 of the Domestic Relations Law provides that ‘ ‘ If satisfied that the moral and temporal interests of the foster child will be promoted thereby the judge or surrogate shall make an order approving the adoption ”. The power to approve the proposed adoption necessarily carries with it the power to disapprove. However, the court’s power to approve or disapprove of an adoption to which an authorized agency has given its consent is not tantamount to nor so broad as to include the power to make the selection of the foster parents for the agency or to compel the agency to consent to an adoption by foster parents of which it disapproves.
Even though the Family Court may in this custody proceeding exercise all the powers of the Supreme Court (N. Y. Const., art. VI, § 13, subd. c; Family Ct. Act, § 651), it must be remembered that even the Supreme Court with all its inherent equity powers cannot grant an adoption (Erlanger v. Erlanger, 102 Misc. 236, 237), jurisdiction of which as of September 1, 1967 is exclusive with the Family Court. Adoption was unknown to *113 the common law and exists in this country only by virtue of statute (Matter of Thorne, 155 N. Y. 140,143; Matter of MacRae, 189 N. Y. 142, 143; Carpenter v. Buffalo General Elec. Co., 213 N. Y 101, 104; Bets v. Horr, 276 N. Y 83, 86, 87; Matter of Maxwell, 4 N Y 2d 429, 436). In this State an adoption can be consummated only under the conditions prescribed by statutory authority (Matter of Cohen, 155 Misc. 202, 205; Matter of Ziegler, 82 Misc. 346, 350, affd. 161 App. Div. 589; Matter of Pierro, 173 Misc. 123, 124; Matter of Davis, 142 Misc. 681, 688) and like all statutory proceedings there must be strict observance of the statute (Matter of Santacose, 271 App. Div. 11, 16).
In Matter of Santacose (supra) the Commissioner of Welfare having custody of a child surrendered for adoption attempted to take a neutral attitude as between two sets of proposed foster parents who sought to adopt the child, saying that he would be satisfied with whatever determination the court made. The Appellate Division, however, upon reviewing an order of adoption made without the Commissioner’s consent condemned such a hands-off attitude by the Commissioner saying that the responsibility for making a selection of adoptive parents was placed by statute on the Commissioner and that he could not shift the responsibility for making the initial choice of adoptive parents to the County Judge. Moreover, the court held (p. 18) “ that the two statutes ” (referring to section 384 of the Social Welfare Law providing for the surrender for adoption of a child to authorized agency and section 113 of the Domestic Delations Law providing for the agency’s consent to an adoption) “ contemplate and intend that, in such a situation as the present one, the only basis for an adoption is the execution by the Commissioner of Public Welfare of a written consent which takes the place of, and is so intended, the written consent of the natural parents required in the case of a voluntary adoption.” The statutory requirement of obtaining the Commissioner’s consent not having been obtained, it was held that the adoption lacked jurisdictional basis and consequently the order of adoption was reversed and vacated.
It, therefore appears that unless the Commissioner of Welfare gives his consent to the adoption of this child by the respondents, which he has said he will not give, an adoption may not be consummated and any order of adoption made by this court without his consent would be without jurisdictional basis. Although they cite no authority for their contention the Adoptive Parents Committee Inc. urge that the power to approve an agency adoption without the agency’s consent may be found in the language of section 141 of the Family Court Act. Broad as is *114 the “ wide discretion ” and heavy as are the “ grave responsibilities ” given to Family Court Judges by section 141 of the Family Court Act, I do not think that these findings of the Legislature are intended to confer any unrestrained grant of power to disregard the plain language of other statutory enactments. Discretion is not the equivalent of unbridled power.
The Adoptive Parents Committee have, however, suggested an ingenious way to escape the dilemma. It is this. Let the court in this proceeding find that the welfare and best interest of the child require that its custody be awarded to the foster parents and make an award accordingly. Section 111 of the Domestic Belations Law prescribing whose consent shall be required for adoption provides in subdivision 4: “Of any person or authorized agency having lawful custody of the foster child.” The foster parents now having lawful custody of the child pursuant to the order of this court in these proceedings, only their consent to their own adoption of the child would be necessary. The authorized agency’s consent Avould no longer be required since it has been deprived of laAvful custody.
Some acceptance of this specious reasoning may be found in the opinion of the Supreme Court Justice in Matter of Mary I. -v. Sisters of Mercy (200 Misc. 115, 123, supra), Avhich he frankly acknowledges to be in the nature of obiter where he says: ‘ ‘ Moreover, it may Avell be that if the result reached in this case is sustained,” (i.e., an award of custody to foster parents) “that a Surrogate may find that laAvful custody, as is here determined, is in Mr. and Mrs. I.-and not in the authorized agency and that the consent of respondents as indicated in section 111 of the Domestic Belations Law is unnecessary. ’ ’
The flaw in this line of reasoning is, of course, that it assumes that the best interest and welfare of the child, Avhich alone can support an award of custody of any child, may in a contest between boarding parents and an authorized agency having lawful custody of the child be determined without reference to any permanent plan for the placement of the child or stabilization of its status through legal adoption. This premise I reject for the reasons heretofore stated.
Stripped of all irrelevancies and emotionalism the resolution of this contest betvreen the agency and the boarding parents for the right to determine this child’s future resolves itself into a balancing of the relative importance to this child and her future of her immediate, short-term need for a home with familiar surroundings, a mother’s love and a child’s sense of security against her long-term needs for lasting acceptance into a family *115 with greater life expectancy and which more nearly coincides with her ethnic and cultural background and her need for a permanent social and legal status in the family and the community. The temptation to be swayed by the immediate emotional needs of this child for familiar home surroundings and the love and affection of the only persons she has ever known as parents is strong indeed. It is, however, a siren song, which if followed, will I believe, lead this child only to heartbreak, emotional insecurity and a questionable social and legal status.
I am keenly aware that to remove this child from the only home she has ever known and from the physical custody and control of the persons she regards as her mother and father will cause some emotional shock to this child, the extent of which may not be accurately measured as evidenced by the wide divergency of opinion of two qualified and competent psychiatrists. Nevertheless, in my judgment the need to find a permanent placement for the child through the medium of legal adoption, but which may not be achieved in the context of her present placement, so far outweighs the emotional pull of the appealing but delusive temporary expedient of leaving the child with the boarding parents, that the risk, incalculable as it is, has to be taken. In making this judgment, I am also not unmindful of the plight of the foster parents who have become so emotionally involved with the fate of this child whom they have come to love as their very own. However, they must realize that unlike natural children who have no choice in the selection of their parents, children who are wards of the State have the right to have their adoptive parents carefully chosen for them and that it would not be in their best interest to allow prospective adoptive parents arbitrarily to select the child they wished to adopt.
Finally, it is urged that nothing is known about the adoptive parents the agency has selected for Elizabeth, so that the court has no basis for comparing the proposed adoptive parents with the Liunis. This is true. The answer to this, however, is the same as that made by the Court of Appeals in Matter of Jewish Child Care Assn. (Sanders) (supra, p. 229) to a similar objection. The court said: “ Nor can we sustain an objection that, since the child is not now being returned to her mother, she should be left with the Sanders because the fitness of her next habitation is presently unknown. As the Appellate Division wrote, we may not indulge an assumption, or even harbor a doubt, that Laura will not be properly cared for under the supervision of Child Care which is an authorized agency and which has proven itself most solicitous for the welfare not *116 only of the child and its mother hut even of the appellants themselves. ’ ’
In my judgment this child’s welfare and interests will be best served by her return to the physical custody of the Commissioner of Public Welfare for placement for adoption. However, in effecting such a placement heed should be paid to the admonition of Dr. Sportsman, Director of the Albany Child Guidance Center, that the transition from foster home to adoptive home be made gradually and be preceded by adequate preparation of the child by all concerned so as to smooth the way for her adaptation to her new environment.
The writ is therefore sustained and the legal custody of the child is awarded to the Commissioner of Public Welfare.

 Shakespeare, Hamlet, Act III, se. 1.