Maxine K. Duberstein, J.
On December 4, 1973 respondent was remanded to Kind's County Hospital pursuant to a referral by Dr. Golomb, psychologist of Rapid Intervention Project (R.I.P.) , after several delinquency petitions were drawn against respondent on various burglary charges. More specifically, the petitions were as follows: D-13178/73, drawn on September 11, 1973 with charges of burglary and possession of burglar’s tools; D-16460/73, drawn on December 3, 1973 with charges of burglary and criminal possession of stolen property; and *352 D-16461/73, also drawn on December 3, 1973 on a charge of burglary.
Despondent was immediately described by an intake social worker at Kings County Hospital as having “ explosive outbursts of rage and extremely poor control over aggressive impulses ”.
On December 13, 1973 after psychiatric examination, a two-physician certificate, with a diagnosis of childhood schizophrenia, was issued. Despondent was referred to Kings Park State Hospital. He was described as “ belligerent and hostile ” with an explosive personality and poor impulse control due to an underlying psychotic condition.
Upon his admission to Kings Park State Hospital on December 18, 1973 a psychiatric examination revealed respondent was * ‘ quite depressed and frustrated ’ \ He was thereafter placed on high doses of medication.
Despondent made his first escape from Kings Park on December 20, 1973. He was described by hospital officials as extremely dangerous to himself and others.
Upon his return to Kings Park from Kings County January 15, 1974 respondent was said to be “ depressed, anxious, tense, and somewhat tremulous ”, and still potentially dangerous to himself and others. It was noted that he was in need of strict supervision, and was again placed on heavy doses of medication.
On February 8,1974 after conference with a psychiatrist from Kings Park, respondent was again diagnosed as having childhood schizophrenia. And on this very same day, he escaped from the hospital for a second time.
Despondent was arrested and brought to court March 26, 1974 on various charges including attempted murder and robbery. (Docket No. 3759/74.) And on March 28, 1974 he was again returned to Kings Park State Hospital via Kings County Hospital.
Examination at Kings Park revealed respondent remained very hostile and argumentative towards everyone.
Despondent escaped from Kings Park for a third time on April 1, 1974. Since that date, charges have been brought against him on three separate petitions, including the case presently before the court. Petition D-4428/74 was drawn on April 9, 1974 charging respondent with burglary, petit larceny, criminal possession of stolen property and criminal trespass. April 24, 1974 on D-5154/74, respondent was charged with burglary, grand larceny, and criminal possession of stolen property. At this time, the court was informed that Kings *353 Park State Hospital considered respondent so dangerous that they could not accept him back. Arrest warrants were issued by this court for respondent.
On May 29,1974 respondent was arrested on the case presently before us. A finding on admission of criminal trespass was made on June 3, 1974.
In view of respondent’s history, testimony has been taken from Dr. Lambert, psychiatrist in charge of the children’s unit at Kings Park State Hospital, and Dr. 0 ’Connor, a psychologist and patient care co-ordinator for the adolescent ward at Kings Park as to the type of facility necessary for the care and. treatment of respondent.
Dr. Lambert testified that he has diagnosed respondent as having childhood schizophrenia, psendopsycopathic type. He also testified that respondent is a mentally ill person within the definitions of the Mental Hygiene Law. (See Mental Hygiene Law, § 1.05, subd. 17.) It was further elicited from Dr. Lambert that he felt the respondent was treatable, but he also noted that respondent is dangerous and a potential murderer. The doctor explained that, in his opinion, respondent desperately needs an “ open-door setting ” in a maximum security surrounding. He cites as support for this theory an article, “ Identifying and treating the Potential Murderer ”, in the March 15,1974 issue of the Roche Report, Frontiers of Psychiatry.
In that article, Derek Miller, M.D., and professor of psychiatry at the University of Michigan, Ann Arbor, urges the creation of a specific type of center to send potentially murderous persons. He states ‘ ‘ such centers should protect society from inmate escape while providing ‘ noninstitutionalizing ’, deceptively free living conditions in which the patient works closely with a team of in-house therapists. The illusion of freedom is necessary to counterbalance the long-reinforced dehumanization pattern of these patients.”
Dr. Lambert went on to state, however, that there are no such facilities presently available in New York State for this type of child. He described the present facilities as not capable of providing for aggressive personalities where children under the age of 16 years are involved. In response to court inquiry, it was discovered that such facilities are available for persons over the age of 16 years.
Dr. O’Connor revealed that the respondent is the only patient of his kind at Bangs Park, in that he is not retarded or a victim of borderline mental retardation, as are all the other patients in his ward. She further stated that she sensed the respondent *354 was a very dangerous boy upon his admission to Kings Park, and felt that he really needed a 24-hour guard for his own protection and for the protection of others at Kings Park. Dr. O’Connor noted that although heavy doses of medication were administered to respondent, the medicine had no effect on controlling respondent’s hostility or his relationship with others. She related that although respondent was very withdrawn in general, he provoked many fights and created havoc amongst the other patients.
Dr. 0 ’Connor is in full agreement with Dr. Lambert that the “ open-door setting ” in a maximum security facility is what is necessary for the appropriate treatment of respondent. She also agrees no such facilities are presently available in New York State for children under the age of 16 years. i
This court is outraged that the great State of New York has not seen fit to provide closed psychiatric settings for youngsters who are in need of such a surrounding and who are dangerous to our communities. Such settings are available for adults and children over the age of 16 years.
The child involved herein is extremely dangerous and, as has been testified to by Dr. Lambert and Dr. O’Connor, is in need of strict supervision. Who is to answer if this youngster escapes again from a State facility and commits a grievous crime? Certainly, it is not the court’s responsibility to create or maintain these facilities. Rather, it is the responsibility and duty of the Commissioner of Mental Hygiene to provide necessary facilities of the type prescribed for respondent in the instant ease. (See Mental Hygiene Law, §§ 7.05, 9.03.) These children are in desperate need of and are entitled to such care, education, and treatment as can appropriately be afforded them. (See Usen v. Sipprell, 41 A D 2d 251. Also, see, N. Y. Const., art. XVII, § 1 et seq.; N. Y. Const., art. XI, § 1 et seq.)
Certainly, if closed psychiatric settings with deceptively free living conditions are available for adults and children over the age of 16 years at Matteawan ¡State Hospital, there is no good reason why this type of facility is not available for youngsters who may, as a result of proper treatment, become responsible citizens in the future.
The obligation does not rest with the Commissioner of Social Services, or Division for Youth to insure proper treatment for mentally ill children. They certainly are not equipped to do so.
The court firmly reiterates that it is incumbent upon the Commissioner of Mental Hygiene, in the performance of his duties for the People of this State, to provide suitable settings. *355 such as the type hereinabove described, for treatment of mentally ill youngsters. In this regard, see Usen v. Sipprell (supra); Matter of Leopoldo R. (Family Ct., Kings County, May 9, 1974, Rigler, J.); Matter of David M. (Family Ct., New York County, March 18, 1974, Miller, J.). This obligation is is particularly apparent where the youth is a danger both to himself and the community. And further, it is a fundamental right of these children to receive the necessary education and treatment required for their respective problems. (See Usen v. Sipprell, supra; N. Y. Const., art. XVII, § 1 et seq.)
In consideration of the foregoing, it is hereby ordered that respondent be placed with the Commissioner of Mental Hygiene ; and it is further ordered that, pursuant to powers granted the court under section 255 of the Family Court Act, the Commissioner of Mental Hygiene provide a facility for respondent which will offer him the setting and treatment specifically recommended for his condition; and it is further ordered that in case no suitable facility is presently available to treat and contain the respondent, that he be placed in a maximum security facility pending the imminent provision of such appropriate facility as hereinabove described; and it is further ordered that the Commissioner of Mental Hygiene report to this court on August 6, 1974 concerning placement and treatment of respondent.