Howard A. Levine, J.
Petitioners are certified foster parents who are seeking an order under section 255 of the Family Court Act directing the respondent Commissioner of Social Services to return to them a child presently in foster care, who had been placed with them during a previous period of foster care. Her present 18-month placement arose out of a child protective pro *218 ceedinig before me in which, she was adjudicated an abused child, and this application is incidental to that proceeding.
Respondent has moved to dismiss the petition on the grounds that petitioners lack legal standing and that the court lacks judisdiction under section 255 to grant the relief requested.
The controlling facts for purposes of determining the motion. to dismiss are those alleged in the petition and those established during the child protective proceeding concerning the history of custodial care of the child. They are as follows:
Samantha, born out of wedlock July 7, Í972, was taken into foster care in December, 1973 under, a voluntary surrender by her mother. The original contact with the mother was as a result of a child-neglect report. She was placed in one foster, home by respondent for about three months and her. placement was then transferred to the petitioners, as previously certified foster parents, March 1, 1974. It is alleged that she thrived under the petitioners ’ care, changing from a shy, insecure infant to an emotionally healthy and happy one, fully integrated into petitioners’ family life.
In late May, 1974, the respondent’s foster care caseworker determined that Samantha could safely be returned to her mother and accordingly petitioners relinquished custody, as they were required to do under the terms of -the original foster placement. It is further alleged that the caseworker had been, completely satisfied with the care petitioners gave Samantha, and assured them that she would be returned to them if her mother became incapable of caring for her.
In late September, 1974, respondent’s agency sought and was granted an order under article 10 of the Family Court Act for temporary removal of Samantha from her mother’s custody and a child abuse petition was filed within three days thereafter. The same caseworker placed her in foster care, not with petitioners, but with another foster family. A second such petition involving her two-month-óld sister was filed in October, and the child protective proceedings involving both infants were consolidated for the trial held November 19, 1974. Following the trial, the court made a finding that Samantha was an abused child and placed her in the custody of the respondent’s agency for 18 months. She has been with the second foster family since the time the order of temporary removal was granted.
Rased upon the foregoing, petitioners have set forth factual allegations which if true would establish that it "would be in the best interest of Samantha for her to be returned tq them for continued f oster care. They have recited that a strong mutual *219 bond of attachment was formed between them and the child and that her emotional health would be best protected :by minimizing the number of “ (parent figures ” with whom to identify during this unfortunate, but necessary, disruption of her young life. These conclusory allegations have support in current social science theory. As pointed out in Goldstein, Freud and Solnit, Beyond the Best Interests of .the Child ([New York, 1973], pp. 11, 40-42), children have a different sense of time than adults, and the younger the child, the more significant are shorter periods of its life experience. Therefore, the emotional attachment described by petitioners could definitely have been created during the three-month period of foster care. The same authors (pp. 31-34) emphasize the need to minimize discontinuity of parent-child relationships, which would thus militate against multiple foster parent placements. The latter point is also stressed in an article by .Lewis, Foster-Family Care: Has It Fulfilled Its Promise? ('355 The Annals 31, 32-40 [1964]) in which the author points out the apparently injurious effect upon children in foster care of experiencing placements in more than one foster home, and that this unfortunately occurs with respect to 58% of all children in foster care.
Therefore, .apart from the legal issues raised by respondent’s motion, if these facts were established and not met by countervailing evidence, a direction to respondent to return her to petitioners would be appropriate. I now turn to these legal issues:
petitioners’ standing
Respondent’s assertion that petitioners have no legal standing to bring the instant proceeding appears to rest on the arguments that no legal rights whatsoever are created out of the status of being a foster parent, and that respondent’s legal status, created out of the award of custody to his agency in the child abuse proceeding, is so superior that Ms discretion on questions of placement is totally unfettered and uncontrolled. Bach of these is inconsistent with the decisions in Matter of Reed v. Daniels (45 A D 2d 980), and Matter of Fitzsimmons v. Liuni (51 Misc 2d 96) which reject standing as an issue in contests between agency and foster parent. In Reed, the court held that the decision of the Family Court not to hold a hearing on the best interests of the child in a custody dispute between foster parents and the Director of Social Services was erroneous. It expressly recognized the right of such foster parent ‘ ‘ to make application either by petition or by writ of habeas corpus to regain custody of their foster child.”
*220 In Fitzsimmons v. Liuni, Judge Elwyn .of the Ulster County Family Court also disapproved any notion that foster parents lack standing because of the superior rights of the agency. After an exhaustive analysis of the previous authorities, Judge Elwyn concluded that it is the court, and not the agency, which stands as parens patriae with respect to a child before it, at least where the superior rights of a natural parent are not involved.
While these decisions arose in the framework of habeas corpus proceedings no valid distinction should be made because the vehicle employed for obtaining custody here is an application under section 255 of the Family Court Act. Indeed, the allegations contained in petitioners ’ pleading would be amply sufficient as a petition for custody or writ of habeas corpus. The cases cited establish that once the foster child is before the court the foster parent can assert rights to custody and the court may award custody if it determines that it is in the best interests of the child. In essence, the equity powers of the Supreme Court with respect to children within its jurisdiction have been extended to the Family Court and the standing of the party initiating the proceeding is irrelevant as an issue. These equity powers were described by Judge Cardozo in Finlay v. Finlay (240 N. Y. 429). The court, acting as parens patriae to the child before it, “may act at the intervention or on the motion of a kinsman, if so the petition comes before him, but equally he may act at the instance of any one else ” (p. 434).
Moreover, using a section 255 order to obtain physical custody by the foster parent should be preferred to a direct custody petition or writ of habeas corpus in the particular context of the instant ease. In this way the Department of Social Services retains legal custody and will thereby be better able to continue its efforts to rehabilitate the biological family unit (including supervising visitation) leading to the return of the child to her mother ior, if that proves to be unfeasible, to perfect alternative plans for permanent placement in a stable family environment.
JURISDICTION OF THE COURT UNDER SECTION 225 OF THE FAMILY COURT ACT
By chapter 1016 of the Laws of 1972, section 255 of the Family Court Act was amended to expand the power of the Family Court to .order any local county or State officer, agency ior institution ‘ ‘ to render such information, assistance or cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, or supervision or custody as may be required to further the objects of this act.”
*221 Clearly Samantha is a child within the jurisdiction of the court through the respondent’s initiation of the proceeding under article 10 in which she was determined to be an abused child, and her custody was awarded to respondent’s agency. Moreover, the inclusion of parts 6 and 7 in article 10 to provide for post-adjudication proceedings dealing with an abused child also establishes that the court is to exercise continuing jurisdiction over such a child to do what becomes necessary in. furtherance of its welfare. Clearly, also, respondent’s agency has the “legal authority” to place Samantha with petitioners as certified foster parents.
■The legislative, history of the. 1972 amendment to section 255 under consideration has been extensively described in a number of judicial decisions rendered since it became effective July 1, 1972, notably in Matter of Edward M. (76 Misc 2d 781, affd. 45 A D 2d 906). It is sufficient to state here that the amendment was "proposed by the New' York State Assembly Select Committee on Child. Abuse after hearings conducted by that committee reveialed that the purposes of. the Family Court Act were being frustrated by the inadequacy of auxiliary services furnished ■the court and the fragmentation of services and bureaucratic practices of the public child-caring agencies of the Staté.
While research discloses no reported case dealing with the precise question presented here, section 255 has been invoked in a variety of situations involving more drastic interference with administrative practices than would, result from granting the relief sought iby petitioners in the instant case. Thus, in juvenile proceedings under article 7, local school boards have been ordered to transfer children from one school to another or enroll them in special schools (Matter of John M., 75 Misc 2d 672; Matter of Carlos P. (78 Misc 2d 851); a Police Department has been ordered to expunge its arrest record of a child whose delinquency petition was dismissed for failure of proof (Matter of Terrance J., 78 Misc 2d 437); a Department of Social Services has been ordered to find a suitable place for a child charged with delinquency to avoid keeping him in detention solely because of the absence of parents to whom he could be remanded during the pendency of the proceedings (Matter of Norman G., 74 Misc 2d 710); the State Commissioner of Mental Hygiene has been ordered to provide suitable residential treatment facilities for emotionally disturbed juveniles in delinquency proceedings (Matter of David M., 77 Misc 2d 491; and Matter of Graham S., 78 Misc 2d 351); and a local Department of Social Services has been ordered not only to provide a foster home for court *222 placement in a particular delinquency disposition, but also to formulate a plan for furnishing foster homes for future similar placement needs of the court (Matter of Edward M., 76 Misc 2d 781, affd. 45 A D 2d 906, supra).
The foregoing decisions were made in proceedings under article 7 of the Family Court Act, but their reasoning is equally applicable to the instant proceeding under article 10. Indeed, a persuasive argument can be made that a section 255 order is even more appropriate in a child protective proceeding. As previously pointed out, the legislation was sponsored by the Assembly Select Committee on Child Abuse and arose out of its findings concerning the inadequacies of all aspects of the State’s child-protective system. It is noteworthy that among the ills of that system criticized by that committee in its 1972 report, was the practice of moving* foster children from one foster home either to others or to institutions, to avoid close emotional ties from being* formed between foster parent and child (p. 96):
“The child’s position in foster care is further complicated by 'the policy prohibiting foster parents and the ,children from ■becoming too emotionally involved. This policy is based on the theory that foster care is temporary with the return of the child to his natural parents the ultimate objective. Undue affection on the part of .the foster parent, it is asserted, could cause emotional ambivalence if and when the child is returned to his natural home. It is not unusual for agencies to remove children from a foster home because foster parents have shown too much love. One agency precipitously removed a nine and an eleven year old child from a foster family in which they were thriving, because after three years of placement the agency believed that the foster parents were becoming unsuitably attached to these children. The children were placed in an institution. The foster parents brought the matter to court but by the time it was resolved in their favor nine months later, the children felt so rejected by their foster parents and so confused that they refused to return to them. Prior to their admissions to the institution both children had I. Q.’s .of about 120. It is unlikely that their potential abilities will be developed in 'the institution, where the average I. Q. is 90.
Hence the foster parent and the agency find themselves in the untenably ambivalent role of providing a warm home, but a home without to,o much love. When foster parents follow such guidelines, the children, in turn, perceive foster parents as they *223 perceive ,their own parents — unable or unwilling to fully love them”.
Under section 1061 of the Family Cdurt Act, the court on its own motion could vacate its previous order of placement of Samantha with respondent’s agency, and place her directly with petitioners as a “ suitable person” under section 1055. The use. of section 255 is. also preferable to that procedure, for the same reasons that it. is preferable to a direct custody petition by the foster parent since it insures continued participation and f esponsibUity; of the agency in.providing for the care and welfare tit the child;
For the- foregoing reasons I conclude that petitioners have alleged sufficient facts upon which the court could .find, .that Samantha’s best interest would be served by respondent’s transfer of her physical custody to them, and that there are no legal impediments to.the granting of the relief they seek. They will therefore be granted the -opportunity to establish these facts at a hearing*to b.e held December 23,1974 at 10:00 a.m. and the motion to dismiss the petition is denied.